Appeal of **KELLER MECHANICAL ENGINEERING CORPORATION.**          Docket No. 2087.

Evidence presented in this appeal *held* insufficient to warrant the Board in determining the definite capital value of patents in controversy.

Submitted April 9, 1925; decided May 21, 1925.

*Laurence A. Tanzer* and *James C. Peacock, Esqs.*, for the taxpayer.

*Ellis W. Manning, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from a determination of a deficiency in tax for the calendar year 1919 growing out of the disallowance of any deduction for the exhaustion of the capital value of two certain patents numbered 877,436, issued January 21, 1908, and 956,769, issued March 30, 1910, for the reason that the cost of such patents has not been proven. At the hearing the taxpayer presented no evidence of the cost of patents but undertook to prove a March 1, 1913, value of them.

FINDINGS OF FACT.

The taxpayer is a corporation organized under the laws of the State of New York, having its principal place of business in the Borough of Brooklyn, in that State. It is the successor in interest, through a merger consummated in 1923, of the Keller Mechanical Engraving Co., also a New York corporation, which in 1904 succeeded and took over a business formerly conducted by a partnership known as the Keller Mechanical Engraving Co.

The taxpayer and its predecessor corporation and prior partnership is, and has been since 1896, engaged in the business of manufac-

turing and selling dies and die-sinking and mold-cutting machines, stamped and perforated metal work, and similar articles, and the business from the beginning has been based chiefly upon certain patents, principally for machines to cut dies automatically.

At the inception of its business in 1896 it acquired by purchase what was then known as the "Campi" patent, which covered a certain die-cutting machine. This machine was known as a reducing machine.

In 1904 the Keller Mechanical Engraving Co. was incorporated and acquired the assets of the business, including the patents covering the reducing machine referred to above. It issued $251,650 par value of its capital stock for intangibles, consisting principally of the said patents.

For a number of years the taxpayer manufactured and sold reducing machines and dies made by the reducing process. Its officers became acquainted with the field of die-using industries. This field is a broad one. It includes, among others, automotive industries, locomotive and car works and railroad shops, drop forgers, navy yards, small arms factories, Government arsenals, mints, builders, malleable steel foundries, and rubber factories; also manufacturers of hand tools, cutlery, scissors, manicure goods, surgical instruments, marine hardware, harvester machinery, saddlery and harness hardware, silverware and novelties, medals, badges and jewelry, lighting fixtures, cabinet and trunk hardware, plumbing supplies, glassware, molded and pressed compositions, dolls, electrical parts and insulating materials.

The experience of the business developed the fact that only a small part of the demand of the die-using industries for die-making machinery could be met by the reducing machine. The reducing machine was useful for ornamental work and for other kinds of fine work to which the reducing process was most appropriate. In the case, however, of the larger number, constituting also the more important part of the die-using industries, including, among others, the industries using drop forgings, the reducing machine was either impractical or unduly expensive, requiring as it did the use of a master three or four times the size of the finished die, with the necessity of a correspondingly large machine and of powerful cutting tools. In these industries there existed during the entire period of the taxpayer's experience a demand for a machine which would cut dies from a master of the same size—herein referred to as a duplicating machine as distinguished from a reducing machine, which works from a larger master.

At the time when the taxpayer entered the field no practical duplicating machine capable of handling the work of the industries referred to had been placed on the market. It was known that such a machine, if it could be developed and marketed, would effect a great saving in the die-using industries over the cost of cutting dies by hand labor, the process then employed. It was also known that there were among the die-using industries a number of strong and powerful concerns which would require duplicating machines, if developed, and which could afford to and would pay for such duplicating machines a price yielding a substantial profit in excess of the profits which taxpayer had been able to realize on the reducing machines.

Among the assets acquired by the Keller Mechanical Engraving Co. at the time of its incorporation in 1904 was an invention for a duplicating machine. The taxpayer proceeded to develop this invention to the point of obtaining patents thereon. Two patents were issued for this invention—No. 877,436, issued January 21, 1908, for a belt-driven duplicating machine, and No. 956,769, issued March 30, 1910, for a motor-driven duplicating machine. After obtaining the patents the taxpayer addressed itself to the task of designing and developing a type of machine under these patents which could be effectively marketed and used. After experimenting for some time taxpayer succeeded in 1912 in developing and constructing a duplicating machine which met the requirements of the trade. This machine had been developed and was ready to be placed on the market prior to March 1, 1913, and met with success. In taxpayer's fiscal year ended June 30, 1913, two of these machines were sold. As soon as the merits of the machine became known the machines found a ready market, as had been anticipated. In taxpayer's fiscal year ending June 30, 1915, 27 of these machines were sold, and in the following year the number of machines sold rose to 96.

The so-called duplicating machines constructed under the patents of January 21, 1908, and March 30, 1910, after a period of experimentation, on March 1, 1913, had been actually developed and constructed and were ready to be put on the market. In the light of the taxpayer's experience of 17 years with the reducing machine, the known conditions in the die-using industries, and the demand existing in those industries for a duplicating machine, it was clear on and before March 1, 1913, that the duplicating-machine patents could cover a field larger than that theretofore served by the reducing machines and at a profit greater than that theretofore realized from the reducing machines, and that the taxpayer could on March 1, 1913, have reasonably anticipated profits arising from the sale and use of the duplicating machines largely in excess of the profits theretofore derived from the sale and use of the reducing machines.

During the period from July 1, 1913, to December 31, 1922, the taxpayer had employed in its business net tangible assets and produced net earnings as follows:

| Year ended. | Adjusted earnings. | Net tangible assets at beginning of period. |
|---|---|---|
| June 30, 1914 | $2,540.56 | $127,670.44 |
| 1915 | 1,914.66 | 128,426.13 |
| 1916 | } 235,408.41 | 127,467.25 |
| Dec. 31, 1916 [1] | | { 247,575.37 |
| 1917 | 109,657.77 | 205,335.35 |
| 1918 | 58,346.98 | 401,100.77 |
| 1919 | 69,467.67 | 418,992.64 |
| 1920 | 57,027.25 | 458,339.97 |
| 1921 | [2] 3,217.81 | 451,158.80 |
| 1922 | 100,230.60 | 430,024.71 |
| Total | 631,376.09 | 2,996,091.43 |
| Average | 74,279.54 | 299,609.14 |

[1] Six months    [2] Loss.

In auditing the taxpayer's income-tax returns for the years 1918 and 1919, the Commissioner refused to allow a deduction for exhaustion of the patents of January 21, 1908, and March 30, 1910, and thus found a deficiency in tax in the amount of $525.63 for the year 1919, from which the taxpayer brings this appeal.

### DECISION.

The determination of Commissioner is approved.

### OPINION.

TRUSSELL: A reading of the record and the testimony in this appeal can not fail to produce the impression that the two patents covering the so-called duplicating machines, immediately upon their issue and on March 1, 1913, had a very considerable capital value, and the taxpayer has computed such value from the tabulation of tangible assets and earnings shown in the findings of fact by applying 8 per cent of the average earnings for the period as the earnings of the tangible assets, and the balance of such average earnings as the earnings of the taxpayer's intangible assets, including its patents, and, capitalizing the figure so obtained on the basis of 15.per cent, has ascribed a total value to intangibles as of March 1, 1913, of $335,405.47. It has subtracted from this figure what it regards as the residual value of the old reducing machine patents and a certain secret process, namely, $57,464.60, thus producing a valuation of $287,940.87 as the capital value of the duplicating machine patents.

It appears, however, that from the inception of the taxpayer's corporate existence in 1904 to the year 1913 its earnings had been produced more largely by the use of its reducing machines than by the sale of such machines, while, after 1913, the earnings which might be ascribed to the duplicating machine patents were expected to be derived more largely from the profit upon the sale of the machines. While large earnings were made during the period from 1913 to 1922, inclusive, the taxpayer has apparently made no effort to segregate the profits from the sale of the duplicating machines from profits arising from the other activities of its business. We are not informed whether the earnings for the period from 1913 to 1922 have been produced largely from the profits upon the sale of duplicating machines or what part of such profits arose from the manufacture of dies produced by such machines or by the old machines. Neither are we informed as to how many of the duplicating machines have been manufactured and sold, except for the three years of 1913, 1915, and 1916.

We are not holding in this appeal that the March 1, 1913, value of these duplicating machine patents may not be properly computed on the basis of profits realized from their sale and use during years following 1913, but we are constrained to hold, in the present state of the record of this appeal, which shows no segregation of profits ascribable to the duplicating machine patents as distinguished from

profits of other businesses, that we are unable to determine what value should be ascribed to those patents and, therefore, what deduction should be allowed on account of their gradual exhaustion.

The determination of this appeal is not to be taken as closing the door to any presentation of facts which will support a definite finding of patent values as a basis for an exhaustion deduction applicable to any annual tax period following the year 1919.